### BOOYE v. L'ENGLE.

#### (District Court, D. New Jersey. June 20, 1893.)

1. TOWAGE—NEGLIGENCE OF TUG—PASSING DRAWBRIDGES AT NIGHT.

A schooner towed by a tug down the St. Johns river, Fla., collided with the piers of a railroad bridge, through the draw of which the tug was taking her, on a dark night. On the previous day the master of the tug, in a conversation with the master of the schooner, had agreed that it was dangerous to tow through a draw at night, and for that reason had waited over night before starting on the voyage, in order to avoid passing after dark another bridge, which lay near the beginning of the voyage. Many experts also testified that towing through a drawbridge at night was not warranted by usage. *Held*, that the tug was guilty of negligence, and liable for the damages.

2. SAME—LONG HAWSER.

It is negligence for a tug to tow a vessel through the draw of a river bridge with a hawser of 35 fathoms or more.

3. SAME.

It is negligence for a tug towing a vessel on a long hawser to attempt to take her through the draw of a river bridge on a course diagonal to the draw.

In Admiralty. Libel by Japhet T. Booye, master of the schooner Ida C. Schoolcraft, against John C. L'Engle, owner of the tug R. L. Maybe, to recover for negligent towage. Decree for libelant.

Curtis Tilton and Henry R. Edmunds, for libelant.
Call & Adams and Goodrich, Deady & Goodrich, for respondent.

GREEN, District Judge. The libel in this cause was filed to recover from the respondent the amount of damages sustained by the schooner Ida C. Schoolcraft by coming into collision with the draw pier of the railroad bridge crossing the river St. Johns, at Jacksonville, Fla., while being towed by the respondent's tug. It appears that on the 19th of February, 1890, the Schoolcraft was lying at Palatka, Fla., having on board about 250,000 feet of lumber. She was destined to Boston, Mass. It was necessary that she should be towed down the St. Johns river, to the open sea, from Palatka; and for that purpose her master made a contract with respondent in this case, John C. L'Engle, for such towage. Upon the river St. Johns, between Palatka and the sea, there are two drawbridges,—one at Palatka, and the other at Jacksonville. It appears from the evidence in this case that the respondent dispatched the tug R. L. Maybe to Palatka for the purpose of towing the Schoolcraft down the river. The tug arrived at Palatka between 8 and 9 o'clock at night, and her master was desirous to commence the towing immediately, but after a conversation with the master of the Schoolcraft about the safety and prudence of towing through the drawbridges at night, it was agreed between them that the tug should not start with the schooner in tow until daylight the next morning. Passing the drawbridge at Palatka safely the next morning, they arrived near the railroad bridge at Jacksonville about 8 or 9 o'clock in the evening of the same day. The night was very dark, and the tide was ebb. In passing through the draw of this railroad bridge the schooner struck the draw pier, and was damaged to the extent of about $4,000, as it is alleged. It is to recover this sum, with interest, that this libel is filed.

The libelant claims that the injury sustained was solely the result of the negligence of the tug, and insists, in the first place, that the attempt to tow the schooner through the draw of the railroad bridge at Jacksonville, after night had fallen, was a direct and positive breach of the towage contract. But I am unable to find, after a close examination of the testimony, evidence to justify this contention of the libelant. As has already been stated, there was a conversation on board the Schoolcraft, between the captain of the tug Maybe and the master of the schooner, about the prudence of towing through the bridges in question after night, but I think it quite clear that such conversation had no relation to a towage contract. That contract, I think the facts show, must have been made previously to the arrival of the Maybe at Palatka, for it appears that the captain of the Schoolcraft was surprised when he found that his vessel was to be towed by the Maybe, having expected to be taken down the river by another boat, and was annoyed somewhat that the tug which was to tow him should have been so late in arriving at Palatka; her arrival being so late, in fact, that he had given her up. If he was expecting a tug to tow him down the river, and especially if he was expecting a different tug than the Maybe to do the towing, it is quite evi-

dent that the arrangement for the towing must have been made previously to the arrival of the Maybe at Palatka. If the contract for towing had already been made, the conversation between the captain of the Maybe and the captain of the Schoolcraft could not in any wise change or alter or add to that contract. I cannot find, anywhere in the cause, testimony which satisfies me that the conversation on board the Schoolcraft, between these two masters, amounted to the making of a new contract, or was intended to be an alteration of one already made before. I cannot, therefore, assent to this insistment that there was a deviation from the towage contract. But the conversation referred to becomes very important in view of another charge made against the tug Maybe, and which concerns itself with the prudence with which that tug was managed. That conversation, as given in the testimony, was as follows:

"Question. Did you have any conversation that evening with the captain of the tug Maybe about towing your vessel down through the bridges? Answer. Yes, sir; we had a conversation. Q. Where was the conversation held? A. In the cabin. Q. Of your vessel? A. Yes, sir. Q. What was the conversation? A. I said to him that I did not think it was prudent to tow the vessel down through the, bridges after night. He agreed with me,—sanctioned it,—and called some one from aboard the boat,—I suppose, the fireman or engineer,—and told him we would not start until daylight, and to let the steam go down. Q. In pursuance of that arrangement, did the tug Maybe, or not, lay alongside of you all night, before starting? A. Yes, sir; she laid alongside of us until daylight, and we started at daylight the next morning."

If it be true that it was imprudent for the tug Maybe to attempt to tow the schooner Schoolcraft through the draw at Palatka at night, such imprudence must necessarily attach itself to the conduct of the tugboat in attempting to tow the schooner through the draw of the railroad bridge at Jacksonville at night. The captain of the tug admits the imprudence of such conduct, and, rather than be guilty of such imprudence at Palatka, he deliberately wasted several hours, although he knew. he would thereby lay himself liable to the angry criticism of his owner. Now, it was the implied duty of the Maybe to tow in a careful, prudent, and proper manner. Any conduct on the part of the tug which violated either of these requirements must be held to be negligence. Therefore, in towing the schooner through the draw at Jacksonville at night,—admittedly an imprudence,—a negligent act was committed. The result of that act was a collision between the schooner and the draw pier of that railroad bridge. No evidence of negligence on the part of the schooner is shown. Clearly, the fault which caused the collision must be placed, in this view of the case, upon the tug alone. It is well to remark that not only does the master of the Maybe admit the imprudence of attempting to tow through a drawbridge at night, but, as well, 16 disinterested expert witnesses, with experience embracing nearly all the waters on the Atlantic seaboard crossed by bridges, declare that towing through drawbridges at night is not only not warranted by the usages of towing, but that it is a dangerous practice. One of them says that "it is always considered a dangerous thing, [that

is, to tow through a drawbridge at night,] and we have always made it a rule to anchor, and wait until daylight to go through a bridge." So far as this bridge at Jacksonville itself is concerned, there seems to be no special or different usage there than is in vogue at any other drawbridge named by the witnesses. It is clearly shown that it is not a custom to tow through the Jacksonville bridge at night. I do not say, as a matter of law, that such drawbridge could not be passed through at night without negligence, but, if attempted to be passed, the towing vessel is bound to see that no damage results to the tow of which she is in charge.

But there is another act of imprudence, which I think amounts to negligence, of which the tug was guilty. Not only did the tug attempt to tow the schooner through this draw at night,—thereby doing a very dangerous thing,—but she towed the schooner with a hawser said to be at least 50 fathoms in length. This is contrary to the usages and customs of good and safe towage. The witnesses produced by the libelant upon this part of the case unanimously hold that it is an improper thing to tow through a draw with so long a hawser. It is exceedingly difficult to control a tow at so great a distance. Even if the hawser was but 35 fathoms in length, as is claimed by the respondent, such length of hawser is clearly, under the evidence in this case, a violation of the usages of good towage, and made the tug, in this respect, negligent. Most of the witnesses insist that it was the duty of the tug to take the schooner alongside in running the draw,—at least, that such was the proper and prudent course to pursue,—or, if not, certainly to shorten the towing hawser to 10, or, at the very utmost, 20, fathoms. I think the fair deduction from the testimony in the case is that common prudence required the tug attempting to pass the draw at night to take the schooner alongside. Then she would have had absolute control of her, and could have regulated her movements in such way that all danger of collision with the pier or the sides of the draw would have been avoided. The omission to do this, under the circumstances, is a negligent act on the part of the tug.

Another insistment of the libelant that the tug was negligent, perhaps is the weightier one in the case. To understand exactly what the negligence charged is, it will be necessary to explain that the channel of the St. Johns river, about a mile above the Jacksonville bridge, is on the southeast side of the river, while the draw of the bridge itself is on the northwest side. In going down the river, after coming past a beacon known as "Beacon No. 27," which is about a mile above the bridge, it is necessary to turn sharply across the river in order to make the draw, and, when well over to the northwest side, turn again to the right, down the river, and then head straight through the draw. It is evident that this last turn down the river must be made by the towing boat some distance above the draw, for before that turn is made both the tug and the vessel being towed are on a course

diagonal to the course of the river and to the draw, and, in order that they may pass through the draw safely, must be "straightened up," as it is called, before entering the draw, so that when the tug enters the draw the vessel being towed may be directly astern.   Now, what seems to have occurred in this case is this: The tug Maybe towed the schooner down the river safely to beacon No. 27.   From beacon No. 27 the tug made a diagonal course across the river, directly heading for the light shining upon the draw pier of the draw.   It was the duty of the tug "to straighten up" the tow before entering the draw.   This I think the evidence clearly shows she failed to do, for all the witnesses that were upon the schooner testify that the schooner, following the lights on the tug, approached the draw diagonally to its opening.   And that the schooner did so enter the draw on a diagonal course, I think, is clearly shown by the fact that she struck first on the southeast pier, then was thrown by the force of that blow, and by the continual operation of the tug in towing her, to the opposite side of the draw, where she struck against the swinging part of the draw, and, as well, by the fact that the schooner struck the pier with her starboard bow, scraping her whole starboard side against the pier to a point amidship, and then went across the draw, and struck the opposite side with her jibboom.   These points of collision are not disputed, and they seem to fix with certainty that the schooner entered the draw, not on a straight line, but heading diagonally across it.   The negligence of the tug seems to have been her failure to turn down the river far enough above the draw to straighten up the schooner so as to bring her directly astern.   Being up the river at an obtuse angle from the tug, the power transmitted from the tug to the schooner by the hawser would naturally tend to force her over against the pier, where she struck.   As an aggravation, perhaps, of her negligence in this respect, it is not denied that the master of the tug, who was acting as master, lookout, and wheelman at the same time, after the tug entered the draw, did not notice whether the schooner was following directly or not. In fact, the master and the mate both say that they did not see the schooner at all after the tug began to turn; and the engineer of the tug, who claims to have been able to see clearly astern, says that after the tug turned into the draw he did not see the schooner.   The night, as has been stated, was very dark,—so dark, in fact, that no wake from the tug was visible,—and the only guide which the schooner had for towing were the lights upon the tug itself.   It is in evidence that the schooner followed these lights closely, and as directly as possible.   In fact, the master of the tug admits this in his testimony.

I think no act of negligence in the management of the schooner has been proved, and upon the whole case, as made, I am constrained to sustain the libel, for the causes assigned.

Let there be the usual decree.